The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit Our final case of the day is No. 19, 1491 Mr. Jarrett, you represent the appellant? That's correct We'd be pleased to hear from you, sir Thank you There are three issues for the Court's consideration in this appeal The first I plan to discuss is whether the complaint adequately alleged that defendant HHS is liable for the contract obligations of Engage Point, Inc. as a mere continuation of Engage Point Under Maryland law, the mere continuation doctrine is one of four exceptions to the general rule that a corporation that acquires the assets of a predecessor corporation is not liable for the debts and liabilities of the predecessor corporation The mere continuation exception has not been codified in Maryland, and the Maryland Court of Appeals has not established an exhaustive test In Academy of IRM v. LVI Environmental Services, the Maryland Court of Appeals mentioned a five-factor test from Rhode Island but found that it could decide that case without adopting the test The court in that case found it did not need to reach the question of adopting the five-factor test because there was, one, or first, adequate consideration paid. And second, there was no allegation that the two management employees that had gone from the predecessor to the successor were instrumental in the transfer of assets Neither of those conditions is present in this case First, with respect to adequate consideration, in Academy of IRM, the plaintiff did not contest the adequacy of the consideration, and there was substantial evidence that it was sufficient. First of all, the price of the security interest had just been negotiated three months before the transfer of assets. And secondly, a bankruptcy court had overseen and approved the sale of a majority of the debt. In this case, the adequacy of consideration is contested. The complaint alleges that the sale of assets from the predecessor engaged one to the successor, HHS, was part of a sham auction designed to avoid paying the obligations to plaintiffs. HHS did not even exist at the time of the supposed auction when it supposedly purchased the assets. The auction was conducted in a manner that would prevent a competitive bid because it was conducted nine days after it was announced, and it was not announced to interested parties. In the nine days, the complaint alleges would be insufficient for a third party to do an adequate evaluation of the assets and make a competitive bid. And last, unlike in the IRM case, the value of engaged points assets had not been recently determined by an arm's length negotiation at the time of the sale of the assets to HHS. The second condition the court of appeals considered in the IRM case, that there was no allegation that the management officials that transferred from the predecessor to the successor were instrumental, is also not the case here. In this case, the CEO, Mr. White, was instrumental in both the loan transactions and the sale of engaged points to HHS, and he was the CEO both of the predecessor and successor. Therefore, it's our contention – so the conditions that prevented the court from reaching whether the five-factor test are not present in this case. And it's our contention that the Maryland Court of Appeals would adopt the five factors it mentioned in the Academy of IRM case, which was summarized and later applied by the Maryland Court of Special Appeals in 2016. Applying these five factors, the complaint plausibly alleges that HHS is a mere continuation of engaged point. The first factor is whether there was any change in ownership and management. Here, plaintiffs allege that there was common management and control between the two entities through White, who was the CEO of both the predecessor and successor, and three other members of the management team that transferred from engaged point, the predecessor, to the successor, HHS. Mr. Jarrett? Yes. This is Judge Clay, and you may be getting to this next, and if you are, I apologize. I understand the argument with respect to the, for lack of a better term, continuity between management. But what about the ownership interest between the two entities? Yes, that's exactly where I'm going. First of all, no court has held that common ownership is required for there to be – no Maryland court, excuse me, has held that there's required to be common ownership between the predecessor and successor for there to be a mere continuation. In the Baltimore luggage case, it explicitly states that common stockholders are not essential, and that's at 562A2-1286-1293, and in that, they're citing to the restatement. And so our contention is that the common ownership is not necessary, but that this case is unique in that Brevet, the venture capital firm that exercised de facto control, acted as a de facto owner of engaged point prior to the sale of HHS, and that Brevet control was known to HHS. The second factor is the continued existence – the second factor under the five-factor Rhode Island test is the continued existence of the selling corporation. While the district court was correct to note that the complaint alleged that engaged point continued to exist, additional allegations made clear that engaged point had conveyed its valuable revenue-generating assets to HHS. Additionally, the complaint alleges that engaged point's management team went from – left engaged point and went to HHS. And the record in this case shows that engaged point has failed to appear to defend the case. Taking these allegations as true and drawing reasonable inferences in favor of plaintiffs, the complaint adequately alleges that engaged point no longer exists as a viable entity. And the Hearn v. Telesis international case states that the continued dormant existence of a predecessor corporation does not preclude successor liability. The third factor – yes, sir? Where did you plausibly claim that HHS's engaged point's corporate successor? Any point to that? We did not use that term. We said that – we used the mere continuation term. Well, if that's so, is that enough? In other words, the question is did the district court erroneously dismiss the claims against HHS? All you pleaded or pled was engaged point's enterprise, not that engaged point is a continuation of HHS. So why wasn't this report right? So we did allege that HHS was a mere continuation of engaged point and that it was an alleged – it was liable. Therefore, for engaged point's contractual obligations to plaintiffs. So I think we did allege that it was – it should be liable under successor liability theory. And additionally, we alleged facts along with them assuming the business and management team and assets of engaged point that HHS had done so. So I believe that we did allege successor liability under those terms. The third factor that applies under the Rhode Island test is adequacy of consideration. And here I want to point out two things. One is that we do allege that there was a sham auction that was designed to insulate the liabilities. And it was designed – the assets were reformulated into HHS to avoid the liabilities to plaintiffs and others. And then the facts that I mentioned earlier that discussed about why there couldn't have been a competitive bid. The district court incorrectly – I'm sorry. It's Judge Clay again. The appellee raises the issue that the auction was held in compliance with state law, in this case New York. Should that have any bearing on this court's review here? I don't think it does. I think that you have to look at the facts of whether there's sufficient facts to allege that – or to conclude that the complaint plausibly alleges that there was insufficient consideration. And I think that there is. And I want to turn to one point of clarification. The district court had focused on the loans that the venture capital firm, Brevet, provided to EngagePoint in determining that EngagePoint received adequate consideration. But I think that's incorrect. The inquiry of whether there was adequate consideration under the mere continuation analysis must focus on the sale of assets to the purported successor… … and not the earlier transaction in which the lender acquired the security interest. And so it's not that the value when the venture capital firm obtained the security interest. It's the value at the time of the sale and whether that was sufficient. The fourth factor under the Rhode Island test is the transfer of any instrumental employees from predecessor to successor. Again, the CEO, White, left and transferred along with three other members of the management team. And then the fifth factor is the purpose of the asset sale, which, again, we allege and we think plausibly allege that it was a sham designed to put the assets beyond the reach of and to avoid the liabilities to plaintiffs, EngagePoint's liabilities to plaintiffs. The second issue that I wanted to discuss that's before the court's attention is whether CEO White was a plaintiff's employer within the meaning of the Maryland wage payment collection law. There's a question here as to which test to apply, whether it be the economic reality test that Maryland Court of Special Appeals applied prior to this court's decision in the Salinas v. Commercial Interiors case. For the reasons that we set forth in our brief, we think that the Maryland Court of Appeals would apply the updated Salinas test. Well, let me ask you this. Isn't the job of the Maryland court to interpret Maryland law and that we really don't have any business doing that? Yes, Your Honor. However, when they haven't spoken on the issue, I believe that the case law says that the Fourth Circuit is supposed to make – to analyze what they think the Maryland Court of Appeals would do. Well, what do you think about the Camposano case that the Court of Special Appeals handed down? So I think that the allegations here establish that White, the CEO, was an employer under that test as well. I think the Salinas test is more – it goes through and sort of explains what had gone wrong with the economic reality test, and I think that the Maryland courts would find that persuasive, especially given the Camposano case. But the Salinas test was applied in federal law, wasn't it? No. The Camposano case, the court concluded that the Maryland wage payment collection law was sufficiently similar to – But the Salinas test – the Salinas test, that's Judge Wynn's case. He was figuring out – trying to figure out – we were trying to figure out federal law. That's correct. The Camposano case – And here we've got to try to figure out what state law is, I guess. Right. And the Camposano case – But anyway, you think the results are the same either way, don't you? Yes, I do. And the Camposano case – But it makes a difference. You just got to say you win anyway you look at it. That's what I hope for. The Camposano case imported the economic reality test that was being used in the federal context at that time. That's why we think that the Maryland Court of Appeals would import the updated economic reality test from the Fourth Circuit. I think for the reasons that we explained in our brief, it's our contention that the facts here meet either test, and we went through the various elements. I think that what's most important from the Camposano test is that what the Court of Special Appeals was looking at was the role of the putative employer in causing a corporation to undercompensate employees and prefer the payment of other obligations or the retention of profits. And I think keeping that in mind, the four-factor Camposano test indicates that Mr. White was the employer. He had the power to hire and fire and was responsible and perpetrated what we allege is the unlawful action. He acted as CEO while EngagePoint decided which debts to pay and enacted the scheme to have plaintiffs agree to accept payment of their wages under the severance agreement and biweekly payments. And then they reformulated EngagePoint as HHS without paying the owed wages. Last, the third issue that we wanted to raise is that we think the court abused its discretion in failing to grant plaintiffs one opportunity to amend the complaint. The law is well set over the place. We did not make a motion to amend. After we received the motion to dismiss, we contended that our allegations were sufficient with respect to these accounts. You didn't ask for leave to amend. Right. What we did ask for in our opposition to the motion to dismiss was we asked that the court deny dismissal or, in the alternative, deny dismissal with prejudice. How can the court err on denying leave to amend when you didn't ask for it? That's what I'm getting at. That's correct. You can't come up here and claim error when you didn't ask the court to take the action that you're complaining about. So the error would be we think the court erred in dismissing the case with prejudice without giving the plaintiff one opportunity to amend. You're saying it should have been dismissed without prejudice. That's our argument in the alternative is that if the court felt that the allegations were insufficient, which we disagreed with, it should not have been dismissed with prejudice, which we did request, and that's in the conclusion of our opposition at Joint Appendix page 80. If you don't have any further questions, I'll reserve the remainder of my time. Thank you, Mr. Jarrett. Thank you, Mr. Jaffee. May it please the court, I'm Peter Jaffee, representing defendants at police HHS Tech Group and Bradley White. And we respectfully submit that the district court was right to dismiss all claims against HHS Tech and against Bradley White. And we further believe that the district court didn't abuse its discretion in dismissing the claims with prejudice. So as with HHS, I think we want to be clear. We have a situation where we have a senior secured lender who has been operating at arm's length to a debtor and who foreclosed on those assets after the debtor couldn't pay its debt. The lender created a company to receive and operate those assets. Now, as a matter of Maryland law, we believe that the newly formed company is simply not a successor to the debtor. And to hold otherwise, we submit, would invert the law of secured creditors. It would mean that secured creditors, after they foreclosed on assets, would become liable to unsecured creditors. As to Bradley White, what we have here is a CEO of a direly distressed company that finally collapsed. And so this is not some kind of closely held corporation where he was also the owner of the company. This is not Bradley White, LLC. Ultimately, Bradley White was just another employee himself. And as a matter of Maryland's payment and collection law, he is therefore not an employer who's personally liable for wages of employees who didn't get their final paychecks. Mr. Jackson? Yes. This is Judge Klee. And I know we're going to talk some more about Camposano versus Salinas test. And I also know that Maryland code doesn't give us much direction. Is there any other case you can point us to that more affirmatively states that an executive like Mr. White, in this case, does not qualify or satisfy the definition of employer under the Maryland Wage Payment Collection Act? Yeah, I think that this is fairly stated in Camposano, which in three different places talks about the fact that you've got a non-owner general manager of a company. Excuse me, not a general manager, a supervising employee of a company who's not liable. I also think that we need to flip that question. There is not a single case that anybody has cited where an individual was held liable as an employer. In the absence of a closely held corporation where my favorite example is Matt's Kebabs. That's a case in the district court below where you've got somebody who owns a company, runs a company, and for all intents and purposes is the company. Those are the only cases where we found any court, whether in Maryland or the district courts below, finding that an individual could be personally liable tantamount to an employer. Finally, we believe that the district court was affirmatively right to dismiss these claims with prejudice, and therefore it was not an abuse of discretion. First of all, I just want to make clear, there are a number of claims below that were abandoned right out of the gate. Those have not been appealed, so those are out of the case. But even for the two claims that are left, this successor claim against HHS and this employer claim against Bradley White, we believe that the court was right to dismiss with prejudice because the plaintiff didn't just fail to allege enough facts to state a claim. We believe that they affirmatively pled themselves out of court by alleging that there is a valid foreclosure sale and by alleging that Bradley White was a CEO, not an owner. If I can elaborate on the successor liability point, what we think here is that they have not pled successor liability. They've affirmatively pled the opposite. If you look at the Maryland cases, we think they're pretty clear. Successor liability and mere continuation, it's about protecting creditors against owners who are shuffling assets around companies to avoid paying the creditors. That's why the cases emphasize that common ownership is critical to the inquiry. I believe that all of the cases say that, from Baltimore Luggage to Academy of IRM to Nesson and others. As the Maryland courts rightly put in, as this court noted a few minutes ago, you need continuity of entity, not just continuity of enterprise. Here, the executives haven't alleged that the putative predecessor and the putative successor are owned by the same people. Very surprisingly to our mind, they haven't alleged who owns Engage Point at all. They certainly haven't alleged that Purvey owned Engage Point. That's telling, Your Honor, because they do allege that they were executives of Engage Point, one of them for 10 years. In fact, one of them alleges that he had some stock in the company. If anything, the only owner he's ever pointed to is himself. That's telling. If anybody could allege who owned these companies, they could have. By any account, ownership is a critical question to the inquiry. They simply never alleged it. To the contrary, what I think is clear is that they are alleging that Purvey is not an owner. I think that the counsel just conceded that a few minutes ago. What they describe is an arm's-length relationship with a secured lender, not some kind of ownership interest that Purvey had in the company. I think that they absolutely failed the threshold. They've alleged a situation that falls into the Academy of IRM case. Let me put it in a slightly different way. Here what they've alleged is that a secured creditor validly foreclosed on the assets and that they are unsecured creditors. Applying the black-letter law of secured lending, that means that Purvey had priority to Engage Point's assets, not the executives who weren't secured at all. It's not like they had any kind of lien. They hadn't obtained a judgment. They hadn't tried to obtain a judgment lien. The assets were rightfully Purvey's after Engage Point couldn't pay its debts, which were substantial debts. The plaintiffs allege about $65 million of debt. We submit that the affirmative allegations that they've made requires dismissal in this case and requires it with prejudice. We don't think that they can state a claim in those circumstances. Moving on to Bradley White's supposed employer liability, we submit that, first of all, there's no question who actually employed the executives. It was Engage Point. Now, the executives contend that Bradley White owes unpaid wages of employees because he was the CEO when Engage Point finally collapsed. By virtue of that position, he's somehow their employer. We just don't think that that states the Maryland law under any of the tests that have been posited here. And so we don't think that this court has to decide Maryland law. We think that under any test that's been posited, Bradley White is affirmatively not the employer. So I do think I want to reiterate the point that I made a few minutes ago. You know, some of these cases where employer means something more than employer are joint employment cases. So that's where you've got two corporate employers who share employment responsibilities. The paradigmatic example is you've got a general contractor and a subcontractor or a prime contractor and a subcontractor. And that's what this court was facing in the Salinas case. I also do want to emphasize the Salinas case was about the Federal Labor Standards Act, and it expressly said that it was not making any judgments on the Maryland wage and payment and collection law. There's a footnote where it says, you know, we're not commenting on that. That claim is moot here. But in that case, you know, you've got a prime contractor that's requiring the subcontractor and its employees to say where the prime contractor's clothing and their logo and is directing them on work sites and actually distributing paychecks and whatnot. I just don't think that the joint employer type cases are what's going on here. And then, you know, the second sort of case where you've seen courts finding that sometimes employer means more than employer is where you've got these closely held corporations. So, you know, you've got Matt's Kebab. That's one of the cases that we cited below where Matt is the owner. Matt's the manager. Matt runs everything. The business even bears his name. That's an example of the type of case where you might hold an individual liable. But here, we don't have that sort of relationship. Bradley White didn't hire these employees. You can see from the employment contracts that they attached to their opposition to the motion to dismiss. You'll see that somebody else hired them. The prior CEO. You'll see that they had a whole assortment of sort of executive benefits that comes from having an executive employment contract. These were the one of them was previously the chief operating officer and later the senior vice president of corporate services. The other one was the executive vice president of professional services. So it's hard to imagine that Bradley White, who's a non-owner, who is not. He's a CEO, but he's only been in the position for a couple of months. He's come back to the company, which is in dire straits. And he does ultimately convey to these employees that they've been terminated. It's hard to imagine that that CEO exercises so much overwhelming control over this company that he should be liable as an employer. If anything, you've got one of the points of sort of J. Gann alleging that he actually does own some of the company and that he's, again, the senior vice president for corporate services. If he's alleging that Bradley White is liable to him for unpaid wages, presumably he's liable to a bunch of employees himself who are under his control. And I still think that the Maryland law requires that. The Maryland law, like I said, has never held somebody liable outside of a very substantial ownership interest in a company like this. And as a result, we just don't think that under either Camposano or Salinas that you have a situation where Bradley White can be deemed the employer here. And then finally, to address the dismissal of prejudice, we think the district court was right. Again, we think that the plaintiff has affirmatively pled themselves out of court by alleging a foreclosure sale of valid antecedent debts. And again, I think the plaintiff just conceded a few minutes ago that the antecedent debts were perfectly valid. Hasn't alleged anything further on that. That runs straight into the role of Academy of IRM and a whole bunch of similar decisions in other states, by the way, the Academy of IRM sites that hold that a secure lender forecloses simply as a successor. And we think that the plaintiffs also pled themselves out of court by alleging that Bradley White is the CEO who came in the last couple of months and that he was really nothing more. In any event, we don't believe that the district court would have abused his discretion after looking at these things and looking at the position of these plaintiffs who truly had a great amount of inside knowledge about this company, EngagePoint, certainly knew the critical elements of the claims. They didn't amend their complaint as of right when they had the chance. That's 21 days after we filed a motion to dismiss. In fact, even in our motion to dismiss where we point out certain key errors as to an issue that's not before this court, but there is an error as to one of the parties that's no longer in the case. They even said, you know, we're not going to amend our complaint. We'll fix things during discovery. In light of that, I think the district court is well within its discretion to say that they first, as you noted earlier, they hadn't even asked to amend. All they asked is that the complaint not be dismissed with prejudice. They certainly never proposed what amendments they would make. Usually in these sorts of cases, you see the plaintiff file a proposed amended complaint where they show what kind of changes they would make to cure the difficulties. I think I may have heard a beep there, so if I may just quickly finish. Yes, you may. I think you did hear a beep, and you may sum up the sentence as well. You have seven minutes left. There was no beep on mine. There was no beep, but I am coming to the end anyway. And so for those reasons, we believe that the district court was right to dismiss the claims of successor liability against HHS. We believe the district court was right to dismiss the claims of employer liability against Bradley White. And we believe that the district court was right to do so with prejudice. Very good. Thank you, Mr. Drakey. Thank you. Mr. Garrett, you've reserved some rebuttal time. Thank you. Just two quick points. I think that I just wanted to reiterate that with respect to mere continuation of successor liability, that ownership is not required, and that the Academy of IRM didn't just say, well, there's not continuation of ownership, so this is over, and neither did NISN, a prior case that was in the product liability arena as opposed to the contract. And, in fact, the first case, the Baltimore luggage company beholdsman case, explicitly states that common stockholders is not essential to a finding of mere continuation. And then with respect to the second issue with the CEO, you know, I think the Campusano case is certainly distinguishable. In that case, the individual who was the putative employer didn't even have the power to hire and fire. That's not the case with the CEO. And these requirements that Mr. Jaffe mentioned as far as the company being closely held or that the individual act as the owner, the supervisor, the manager, those just aren't present in any of the tests. And I think that if you run through the tests, whether it be the Salinas or the Campusano tests, that White in his position with his authority qualifies as an employer under the Maryland wage payment collection law, which the definition of employee obviously is not very helpful in the statute itself, but it is clear that it should be defined expansively, and that is clear. So if you don't have any other questions, that's all I have. Thank you very much, Mr. Jarrett. We appreciate the arguments of counsel, and your case of 1914-91 will be submitted. Madam Clerk, we can adjourn for the day.
judges: Robert B. King, Henry F. Floyd, Thomas S. Kleeh